IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JACQUELINE D. STOKES, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _3:15-cv-1178_____ |
| | § | |
| JEH JOHNSON, Secretary, U.S. | § | |
| DEPT. OF HOMELAND SECURITY, | § | |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT UNDER THE REHABILITATION ACT**

**I. SUMMARY**

Plaintiff Stokes, an employee of DHS Citizenship and Immigration Services, sues under the Rehabilitation Act (applying standards from the Americans with Disabilities Act) for failure to accommodate her low-vision disability (legally blind in one eye) and in light of the reprisal that followed her objections to such discrimination.

In spite of being notified repeatedly of her disability, management did things such as regularly providing her with meeting materials she could not read because of her disability, resulting in her having to disclose her vision problems to others at the meetings. Some 500 days after she started the EEO process about these issues and after a 202-page Report of Investigation was complete, the agency revealed that her reasonable accommodation and medical folders were nearly or entirely empty of related documents.

Rather than respond to Plaintiff's simple reasonable accommodation requests in compliance with the law, her immediate supervisor argued to the EEO investigator that it was unclear whether Plaintiff really had a disability needing accommodation. He also ridiculed Plaintiff's requests for reasonable accommodation to Plaintiff's coworker. As a result of management's inaction and retaliation, she has lost pay, suffered needless stress, and endured migraine headaches, jaw problems, and some worsening of her vision.

## II. JURISDICTION AND ADMINISTRATIVE EXHAUSTION[1]

1.   This Court has jurisdiction because the Defendant is a federal official being sued in his official capacity and the suit raises federal questions, such as claims arising under the Rehabilitation Act, Sections 501 and 504, 29 U.S.C. §§ 791 and 794.

2.   Under 42 U.S.C. § 2000e 16(c), made applicable to the handicapped by 29 U.S.C. § 794a(a)(1), Plaintiff brings this district court action after exhausting administrative remedies.

   2.1.   Plaintiff Stokes timely filed an EEO complaint and timely made amendments to it, then raised amendments with the EEOC once she had requested assignment of an EEOC hearing officer.

   2.2.   She permitted EEOC and the agency well beyond the minimum 180 days required before filing suit for the agency to complete action on her complaint.[2]

   2.3.   Administrative processing was under agency file HS-CIS-00188-2014.

   2.4.   The latest issues are raised within 45 days of their occurrence, the period in which she otherwise would have to have contacted an EEO Counselor.

3.   Plaintiff mitigated her damages to at least the extent required by law and she complied with all conditions precedent to bringing this suit.

---

[1] Assertions in this pleading are made in addition and in the alternative to each other. Plaintiff alternatively may raise some of these matters to the U.S. Office of Special Counsel as having been motivated by whistleblower retaliation.

[2] She requested a hearing before an EEOC administrative judge around August 6, 2014, but as of the filing of this suit had not yet even been notified of one being initially assigned.

### III. PARTIES AND SERVICE

4.      Defendant JEH JOHNSON is sued in his official capacity as the Secretary of the Department of Homeland Security (DHS).  He is being served at 245 Murray Lane, SW/Washington, DC 20528. Plaintiff's employer, Citizenship and Immigration Services (CIS), is a component of the Department.

5.      In addition to service directly on Defendant Johnson, service is being made on:

        5.1.    Attorney General Eric J. Holder,

                with copy also to

        5.2.    the Civil Process Clerk for the U.S. Attorney's Office for the Northern District of Texas.

6.      As well, a courtesy copy is being provided to agency counsel.

7.      Plaintiff Jacqueline D. Stokes is an individual who resides in Rowlett (Dallas County), Texas, within the Northern District.

### IV. VENUE

8.      Venue is appropriate in the courts of the Northern District of Texas as Plaintiff worked for the Dallas, Texas office of CIS/DHS during the period in dispute and it is where the records regarding Plaintiff's employment would have been kept.

### V. LEGAL CONTEXT

9.      The Rehabilitation Act, Section 501, 29 U.S.C. § 791 prohibits discrimination by the federal government against the handicapped.

        9.1.    In adopting this section of the law, Congress stated an expectation that the federal government would be a model employer of the handicapped and would take affirmative action to hire and promote the disabled.

10.     Section 504 of the Act, 29 U.S.C. § 794, prohibits exclusion of the handicapped

        from the benefits of any program or activity conducted by any Executive Agency.

        10.1.   The Department of Homeland Security is an Executive Agency.

11.     The Rehabilitation Act extends to the federal government the Americans with

        Disabilities Act (ADA) declaration that an employer impermissibly discriminates

        when it fails to make reasonable accommodation to the known physical or mental

        limitations of a disabled employee, unless the employer can demonstrate that the

        accommodation would pose an undue hardship. 42 U.S.C. § 12112(b)(5)(A).

12.     An employer has a continuing duty to engage in an "interactive process" to identify

        and implement reasonable accommodations: failure to do so violates the law. The

        interactive process requires good-faith exploration of possible accommodations.

13.     The ADA Amendments Act of 2008 (ADAAA) dramatically broadened the scope of

        persons protected by disability law, redirecting the focus to whether an employer

        complied with its obligations and away from extensive analysis of whether the

        employee's impairment constituted a "disability."

14.     Blindness in one eye may be considered a disability under the ADA, particularly as

        of the ADA Amendments Act of 2008, effective January 1, 2009.[3]

---

[3] *See, e.g., Colwell v. Rite Aid Corp.,* 602 F.3d 495, 501 (3d Cir. 2010) (applying pre-ADAAA definition, yet finding that there "can be no doubt that [Plaintiff's] blindness in one eye is a physical impairment...Nor is there any doubt that seeing is a major life activity" (internal citations omitted). Under EEOC's final ADAAA regulations, at 29 C.F.R. § 1630.2, "physical or mental impairment" now includes any "physiological disorder or condition...affecting one or more body systems, such as...special sense organs" and "major life activities" includes the operation "of a major bodily function, including functions of the...special sense organs...The operation of a major bodily function [in turn] includes the operation of an individual organ within a body system...In determining other examples of major life activities, the term 'major' shall not be interpreted strictly to create a demanding standard for disability" (citing the ADAAA). Eyes are "special sense organs."

15.     Among reasonable accommodations can be modification of equipment or devices; appropriate adjustment or modifications of examinations, training materials or policies; provision of qualified readers or interpreters; and other similar assistance to individuals with disabilities. 42 U.S.C. § 12111(9).67.

16.     A *prima facie* case of disability discrimination typically may involve a showing that a disabled employee is qualified to perform the essential duties of the job (at least if provided a reasonable accommodation), that the employee suffered an adverse employment action (for example, denial of a reasonable accommodation), and that the adverse action appears to be related to the disability.[4]

17.     The confidentiality provisions of the ADA, such as at 42 U.S.C. § 12112(d), generally provide that information obtained regarding an employee's medical history must be treated as confidential. 42 U.S.C. § 12112(d)(3), (4); 29 C.F.R. § 1630.14(d).

18.     It thus can violate the law to unnecessarily disclose information related to an employee's medical ability to perform the job. *See* 42 U.S.C. § 12112(d)(4).

    18.1.   An employer should not disclose confidential information about an employee's medical condition obtained as part of dealing with a reasonable accommodation request, given that it was derived from an employment-related medical inquiry.

19.     A *prima facie* claim of retaliation under the Rehabilitation Act generally involves the employee's demonstrating that she engaged in protected activity and suffered an adverse consequence, also making a showing that the two appear related.

---

[4] At least as to federal employees in the Fifth Circuit, the standard of causation in a claim of disability discrimination is "motivating factor" rather than "sole causation." *See Pinkerton v. Spellings,* 529 F.3d 513, 519 (5th Cir. 2008).

20.     At least in the federal employee context, EEOC has ruled that negative comments about protected EEO activity that are likely to have a chilling effect on future potential EEO activity may be considered *per se* retaliation.[5]

21.     While EEO Counseling otherwise can be a prerequisite for a federal employee to formally pursue a particular claim, it is not needed for new matters that are "like or related" to existing claims and issues. 29 CFR § 1614.106(d).

## VI. ADDITIONAL CLAIMS

22.     Plaintiff works as a GS-301-11 Operation Support Specialist in Dallas (Texas Service Center) for Citizenship and Immigration Services, the component of the Department that oversees lawful immigration, such as by processing applications for citizenship, work authorizations, and asylum.

23.     Gregory Richardson, Director of the Texas Service Center, is generally aware of the issues set out below but chose not to take adequate corrective action to protect Plaintiff Stokes from suffering the described harms.

    23.1.   For example, he is aware of her disability from participation in a meeting around January 12, 2012 in which Plaintiff Stokes informed him that she was legally blind in one eye. Her first-line supervisor Jeffrey Sampson was present too, as were another management official and a union official.

24.     Plaintiff Stokes is qualified to perform the essential duties of the position, at least when reasonable accommodations are provided. For example, her most recent annual rating (FY2013-14) was at the "exceeded expectations" level.

---

[5] *See, e.g., Webster v. DOD,* EEOC Appeal No. 0120102276, 2011 WL 4527014, 1 (Sept. 20, 2011) (decision of EEOC Office of Federal Operations).

25. Being legally blind in one eye, she is a person with a disability protected by the Rehabilitation Act, applying standards under the Americans with Disabilities Act.

   25.1. The term "legally blind" generally means "a visual acuity of 20/200 or worse with the best possible correction, or a visual field of 20 degrees or less." *See, e.g.,* www.eeoc.gov/eeoc/publications/qa_vision.cfm.

26. She also is protected as a person with a record of having such a disability.

27. Her disability is known to Defendant: she was hired in 1999 under Schedule A.

   27.1. "People with disabilities can be appointed to Federal jobs non-competitively through [this] process called Schedule A." *See* www.opm.gov/policy-data-oversight/disability-employment/.

   27.2. For Schedule A coverage, one must have "an intellectual disability, *a severe physical disability*, or a psychiatric disability" (emphasis supplied). *See* www.eeoc.gov/eeoc/initiatives/lead/abc_applicants_with_disabilities.cfm.

28. Plaintiff first requested a reasonable accommodation of a magnifying reader around 2007 and, after an initial denial, it eventually was provided.

29. Her rights under the Rehabilitation Act and Americans with Disabilities Act have been violated on one more occasions, as set out below, by management actions such as denying her reasonable accommodations and forcing her to disclose her otherwise confidential medical condition to others in the workplace.

30. As well, as also set out below, she has suffered reprisal for her protected EEO activity, such as in the form of her second-line supervisor's blocking her from reaching a higher-graded (better-paying) position and issuing Plaintiff a written counseling for not responding to her supervisor on a day when Plaintiff had taken sick leave under her doctor's orders to recover from work-related stress.

31. As well, as below, her first-line supervisor retaliated by ridiculing her EEO activity.

32. Jeffrey Sampson was Plaintiff's first-line supervisor during periods relevant to this complaint.

33. Mr. Sampson is aware of Plaintiff's disability and her record of having one due to one or more of the following (in addition to the meeting around January 12, 2012):

   33.1. Not long after he became her supervisor in 2010, they discussed the fact that the special equipment at her desk was there to accommodate her vision problems.

   33.2. In February 2013, a time when Sampson was her first-line supervisor, an EEO complaint by Plaintiff was settled related to the negative impact on her ability to work resulting from being reassigned to a work station with reduced lighting.

   33.3. Every time he visits her desk he is reminded that she has equipment (such as three monitors and a device on which to place documents for magnification) not typically provided to other employees.

   33.4. Plaintiff has included him on emails objecting to the failure to provide her with reasonable accommodations, such as by providing unreadable documents for group meetings.

   33.5. Mr. Sampson has interacted with IT staff when Ms. Stokes has had problems using her magnifying reader or when it has been upgraded.

   33.6. His knowledge of her seeking reasonable accommodation is confirmed by an October 12, 2013 email from him to Plaintiff, appearing at 000041 of the Report of Investigation [ROI]). There he argued with her about her need for a reasonable accommodation, consistent with the questioning in his sworn

statement, as set out further below, of whether she truly had a medical condition that required reasonable accommodation.

34.   Conchetta Mason was Plaintiff's second-line supervisor during relevant periods.

    34.1.   Ms. Mason is aware of Plaintiff's disability for one or more of the same reasons as Mr. Sampson is aware of it.

    34.2.   Plaintiff has provided Ms. Mason with medical documentation.

    34.3.   Ms. Mason forthrightly admits in the ROI, at 000116, "I am aware she has impaired vision because she had the assistive equipment before I arrived at the [Texas Service Center].

35.   In contrast to Ms. Mason, Mr. Sampson continues to evade and argue about whether Plaintiff is disabled and needs accommodation, saying in the ROI at 000109 that (emphasis supplied):

> I am only aware to the extent that I know she has equipment on her desk to assist in viewing which was placed there before my arrival, but at no time have I ever been officially informed of or seen any documents relating to *an accommodation or medical condition she may or may not have.*

36.   Supervisor Sampson goes on to claim that Plaintiff did not always indicate a need for special equipment on training request forms, had worked at "home without government issued equipment to accommodate her medical condition, if any" and was observed by him to view her smartphone in her cubicle. [Her smartphone in reality is set up so that it enlarges the text to make it readable to her.]

37.   Supervisor Sampson concludes this answer in the ROI by asserting that "based on the above, *I have no knowledge whether or not Complainant has a medical condition which needs accommodation*" (emphasis supplied).

37.1.   His willful ignorance of her valid need for reasonable accommodation is consistent with his repeated violations of her disability rights.

38.   Though expressing doubt about whether or not Plaintiff truly has a disability, Mr. Sampson has not requested that she provide proof of her medical condition.

39.   Had he asked, Plaintiff Stokes could have provided materials such as a March 6, 1991 Texas Commission for the Blind "To Whom It May Concern" letter confirming that she "has a disabling condition and is in need of employment assistance."

40.   Plaintiff has engaged in protected EEO activity such as making requests for reasonable accommodation for her vision problems, initiating EEO counseling and pursuing a formal EEO complaint, participating in the investigation of her EEO complaint, opposing conduct by management that she reasonably believed to be discriminatory in nature, objecting to having to disclose her condition to others as a result of not being accommodated, requesting assignment of an EEOC hearing officer to address her claims, and filing amendments to her EEOC complaint.

41.   After Plaintiff testified around April 4-5, 2013 in the arbitration case of a coworker in which EEO issues were raised, supervisor Sampson became more hostile toward her, leading her to feel threatened and jumpy when he arrived at her workstation.[6]

41.1.   The work environment created by management was so hostile that it interfered with her ability to perform her duties, requiring her to take sick leave, such as to improve her vision which had decreased under the stress.

---

[6] Though not raised as a basis for recovery here because it is the subject of a pending union grievance, Mr. Sampson's motive and his habit/routine practice of engaging with her improperly are demonstrated by his conduct around December 3, 2014 when he met with Plaintiff and a union official in a room. He raised his voice and yelled that no one was leaving the room until a performance appraisal was signed, acting in a manner that caused Plaintiff to believe he might strike her if she got up to leave without his permission.

41.2.   Reprisal for this protected activity of testifying in her coworker's arbitration involving EEO issues is raised as an additional and alternative basis for Mr. Sampson's and agency actions against her subsequent to the arbitration.

42.   Around October 12, 2013, Plaintiff was moved to a computer that did not have a magnifying reader, for a meeting in the Director's conference room.

42.1.   Supervisor Jeffrey Sampson repeatedly asked her questions about what was shown on the screen.

42.2.   She responded that she could not see or read the writing.

42.3.   Before departing the meeting, she explained that she needed to use her magnifying reader.

42.4.   Consistent with his typical reaction to her vision problems, in the meeting Mr. Sampson acted as though he did not believe her claim to be unable to read print on the screen.

42.5.   Prior to her having to disclose at this meeting that she could not read the screen, she believed her coworkers Peter Nation and Theodore Nance to be unaware of her disability.

42.6.   By putting her in a situation in which he knew or should have known Plaintiff would be impaired by her disability, and then continuing to question her ability to participate, supervisor Sampson improperly forced her to self-disclose the confidential fact of her disability to her coworkers.

42.7.   This was confidential medical information previously obtained by the Defendant as part of an employment-related inquiry and so protected from disclosure by the ADA/Rehabilitation Act.

42.8.   The forced disclosure of her condition led her to feel embarrassed and ashamed, also leading her to reasonably worry that her coworkers would think her less likely to be able to successfully perform her job duties.

42.9.   The stress of such actions, in combination with Mr. Sampson's other hostile interactions with her, created a working environment that caused Plaintiff to have to miss work, suffering physical problems such as severe headaches, jaw issues, loss of sleep, and worsened vision. She has also had to spend money for medical care for such problems.

42.10.  Plaintiff discussed what happened at the meeting with HR staff member Terri Jones and with her second-line supervisor Conchetta Mason, who appeared to agree that Plaintiff should not have been put in the position of having to make the disclosure.

43.   Around April 2 and 7, 2014, meetings were held to discuss Standard Operating Procedures. Though aware of her vision problems, neither Mr. Sampson nor Ms. Mason provided the materials in larger print, nor in advance so Plaintiff could review them using her magnification software.

44.   Around April 7, 2014, Plaintiff sent an email requesting the materials in a form that she could see.

44.1.   While Ms. Mason came to her desk and apologized, also expressing regret by email, Mr. Sampson showed no concern and accepted no responsibility.

45.   Around September 9, 2014, Jeffrey Sampson spoke with Plaintiff's coworker Peter Nation to berate him for attempting to order two 30-inch computer monitors.

46.   As recounted in Plaintiff's September 10, 2014 amendment request to EEOC, Mr. Sampson pointed to the area where only Plaintiff Stokes sits and said that if the

30-inch monitors had been received, an employee of Sampson's [i.e., Ms. Stokes] would have used that to accuse Sampson of discrimination or favoritism.

47.   Mr. Sampson went on to say that she just "looks for opportunities to accuse" him and that if the monitors were received, the employee [Plaintiff] would use them to complain against Mr. Sampson. This was *per se* retaliation.

48.   Then, around October 7, 2014, Plaintiff notified the EEOC that she sought to amend her complaint to add this "like or related" issue:

> Whether around September 17, 2014, a meeting at which Complainant was an attendee was held by management, where written materials were distributed without provision of them in a manner that was accessible by Complainant, in spite of multiple prior requests/notifications that her vision disability precludes her from participating in such meetings when she is not accommodated.[7]

48.1.   When Ms. Stokes notified her chain of command that they had (once again) failed to accommodate her, second-line supervisor Conchetta Mason responded with a single word in a September 17, 2:35 p.m. email: "Oh!"

49.   Around November 18, 2014, Plaintiff requested that EEOC amend her complaint to add this further "like or related" issue:

> Whether, on the basis of reprisal for EEO activity, around November 14, 2014, Complainant's first-line supervisor refused to submit paperwork in support of Complainant being upgraded to GS-12." By way of background, there is not a hard deadline for submission of this material, but Complainant has been performing GS-12 duties for an extended amount of time.

---

[7]  Management may argue this was not a major event, but given the number of times Plaintiff expressly identified her reasonable accommodation needs, the stubborn failure to take basic steps to address them, and the negative impact on her ability to participate in group meetings that results, Plaintiff nonetheless is compelled to raise such incidents.

49.1.   Because supervisor Conchetta Mason repeatedly had ignored related requests, Ms. Stokes finally notified her she would file an EEO if Ms. Mason persisted in this failure to submit the materials.

49.1.1. Ms. Mason ignored that message too.

49.2.   Ms. Stokes' third-line supervisor, Michael Santiago, was supportive of the upgrade and is likely to have given Ms. Mason explicit instructions to forward the material. (It is not yet known if Ms. Mason eventually complied.)

49.3.   By comparison, Ms. Mason earlier did submit upgrade materials for an employee who had not filed an EEO against Ms. Mason. That employee, Jon Walter, has since transferred to a position with the agency in California.

49.4.   Reflective of the motive of her first- and second-line supervisors to keep Plaintiff from advancing in reprisal for her EEO activity, they have declined on an ongoing basis to provide her with opportunities to develop additional skills and perform work of other positions, while granting this benefit to employees without disabilities.

50.   The following additional "like or related" issues arose within the past 45 days (the period in which EEO Counseling would have to have been requested, were the issues not like or related to the existing ones):[8]

---

[8] To err on the side of caution, in an April 8, 2015 email to the agency EEO staff and the Counselor for the earlier complaint, Plaintiff's attorney alerted them that if the agency contended EEO counseling was needed for such items, it should start the process. As of the time of filing of this suit, the EEO staff had not indicated counseling was needed.

50.1.   On March 24, 2015, Plaintiff was given a spurious written counseling, which she asserts to have been in reprisal for her earlier EEO activity.

    50.1.1. The counseling asserts that Plaintiff failed to respond to her first-line supervisor when he requested that she initial her appraisal. The counseling appears to have been retaliatory for reasons such as that:

        50.1.1.1.   On the date of her alleged misconduct, Plaintiff had taken medical leave through the end of the year, due to stress caused her by the working environment.

            50.1.1.1.1.   The December 8, 2014 email referenced further below put second-line supervisor Mason and first-line supervisor Sampson on notice that "[b]ecause of the stress that Mr. Sampson has created in my working environment, I am going to have to take off on sick leave for the remainder of this year. I separately will provide medical documentation of that." (The doctor's note was attached to the email.)

        50.1.1.2.   Having gone into the office to give notice of why she was on leave and to provide the doctor's note, Plaintiff did not perform work December 8, taking the full day as sick leave.

        50.1.1.3.   In other words, Plaintiff was on sick leave to try to recover from her first-line supervisor's hostile actions on the very day for which she was disciplined for not responding to his attempts to get her attention.

50.1.1.4.      First-line supervisor Sampson, to whom Plaintiff is asserted to have been disrespectful, did not find her conduct troubling enough to initiate any discipline on his own. Instead, second-line supervisor Conchetta Mason initiated an inquiry on her own more than a month afterwards, though she had not observed the matter first-hand.

50.1.1.5.      Ms. Mason's inquiry into Plaintiff's conduct on the day at issue appears to have started not much more than a month after Ms. Mason was alerted by way of the December 8, 2014, 11:09 a.m. email from Plaintiff that Plaintiff objected to the December 3, 2014 meeting with Mr. Sampson in part because "Mr. Sampson also openly discussed my disability in the meeting, saying he wanted [union representative Gwendolyn] Moss there to read things for me...Mr. Sampson did not seem to care whether or not he [was] disclosing confidential medical information that might not have been known to her."

50.1.2. The counseling also relied on an inaccurate account of Plaintiff's conduct during a February 22, 2015 team meeting (even though that date was a Sunday, a non-workday for Plaintiff and her coworkers).

50.1.3. To the extent the conduct said to be the subject of the counseling actually occurred on the date identified in the letter (February 22, *2014*) rather than 2015, that was a Saturday and so much time had elapsed that raising it in March 2015 would be highly suspicious.

50.1.4. At the March 24, 2015 meeting during which the written counseling was served on Plaintiff and other staff were in attendance, second-line supervisor Conchetta Mason once again forced Plaintiff to self-disclose her disability, asking Plaintiff if she could read the document, rather than allowing Plaintiff to take it back to her desk where she could use a magnifier or providing it in advance to her. As noted earlier, Ms. Mason on multiple occasions has been informed that Plaintiff requires magnification to read a document and knows Plaintiff does not want to have to disclose her disability to others.

50.2. In another incident of apparent reprisal, Plaintiff has learned that she was not paid for work on March 5, 2015 even though she spent more than six hours that day speaking by phone (from her home) to Conchetta Mason about work-related matters.

50.3. As of April 7, 2015, Plaintiff did not find in her medical files with the agency all of the materials that she previously submitted related to her condition and need for reasonable accommodation. Nor did Ms. Mason respond to Plaintiff's April 6, 2015 email seeking such materials that Plaintiff previously provided to the Defendant by way of Ms. Mason.

50.4. It thus appears that the agency also violated the ADA/Rehabilitation Act by failing to maintain her medical records separate from other files. 29 C.F.R. § 1630.14(b)(1) (other than as to noted exceptions, covered medical records "shall be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record…").

51.     On April 15, 2015, Plaintiff likewise was informed that her reasonable accommodation folder contained only a single item, and that she should provide information within fifteen days explaining her desire for a reasonable accommodations or it would be assumed she did not want any.

    51.1.   This April 15, 2015 memo came more than 500 days after Plaintiff initiated EEO Counseling in November 2013, as well as after a 202-page EEO Report of Investigation was completed July 14, 2014 by a contractor the agency hired to evaluate Plaintiff's claims of not being accommodated. The memo also came a week after Plaintiff provided a draft copy of this lawsuit to the agency.

    51.2.   In other words, on April 15, 2015 the agency expressed too little of an interest, too late, in beginning the interactive process for reasonable accommodation, as if all the events described above had never occurred or were entirely unknown to the Defendant.

52.     Plaintiff suffered harm as a result of management's violations of the Rehabilitation Act/Americans with Disabilities Act. For example, she has:

    52.1.   endured intractable headaches, chest pains, insomnia, and teeth-grinding resulting in jaw issues;

    52.2.   suffered decreased vision in her remaining good eye at times;

    52.3.   had to use sick leave to deal with the stress and physical symptoms and to attend medical appointments;

    52.4.   had to pay for additional medical care;

    52.5.   had to consult with an Employee Assistance Program counselor;

    52.6.   incurred attorney fees and expenses;

52.7.   suffered embarrassment and shame at having had her private medical condition disclosed to others;

52.8.   endured ridicule and hostility from her first-line supervisor;

52.9.   received a written counseling;

52.10.  not been paid for one or more days when she performed work; and

52.11.  endured other losses, among which are having materials for her position to be upgraded unduly delayed by her second-line supervisor, resulting in Plaintiff's losing pay that would have resulted from an earlier upgrade.

### VII. DAMAGES AND RELIEF SOUGHT

53.   As a result of the actions of the Defendant, and in spite of mitigating her damages to at least the minimum extent necessary under law, Plaintiff has suffered losses justifying the granting of one or more of the following:

53.1.   equitable relief, such as a declaration that the Defendant violated the Rehabilitation Act/ADA, with an order that Defendant regularly report to the Court on efforts to avoid such conduct in the future;

53.2.   an award of compensatory damages;

53.3.   attorney fees and expenses under the Rehabilitation Act/ADA (and to the extent not fully available there, then under the Equal Access to Justice Act);

53.4.   restoration of lost income and benefits (such as of sick leave) suffered in the past and expected in the future;

53.5.   retroactive upgrade/promotion to a GS-12 position on the date the Court concludes she likely would have received that grade if not for the discrimination/retaliation;

53.6.   reimbursement of past economic damages and an award for any likely future ones; and

53.7.    an award of costs of court, interest, and any other relief determined to be appropriate.

54.    Finally, Plaintiff requests that the Court deny Defendant relief of any kind.

## VIII. JURY REQUEST

55.    Plaintiff requests a trial by jury as to all issues not reserved by law for the court.

## IX. PRAYER

ON THESE GROUNDS, Plaintiff respectfully asks that she be granted the relief sought and that judgment be entered in her favor and against Defendant.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
1227 N. Valley Mills Dr., Ste. 208
Waco, TX 76710
(254) 776-3939
(254) 776-4001 fax


By:  /s/ David R. Schleicher
     David R. Schleicher
     TX Bar No. 17753780
     DavidS@ThisLawFirm.com